# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| TYRONE GREEN, ) | |
| ) | No. 11 CV 8907 |
| Plaintiff, ) | |
| ) | |
| v. ) | Magistrate Judge Young B. Kim |
| ) | |
| MICHAEL J. ASTRUE, Commissioner, ) | |
| Social Security Administration, ) | |
| ) | February 27, 2013 |
| Defendant. ) | |

## MEMORANDUM OPINION and ORDER

In 2008, Plaintiff Tyrone Green applied for Social Security disability benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act. The Social Security Administration ("Commissioner") denied his application for benefits. Green now challenges the Commissioner's decision to deny him benefits and asks the court to either reverse this decision or remand the case for further proceedings. For the following reasons, Green's motion for summary judgment is granted to the extent it seeks a remand and the Commissioner's motion for summary judgment is denied:

### Procedural History

Green applied for DIB and SSI in September 2008, claiming that his disability began on March 24, 2008, as a result of cardiac, neurological, and blood pressure-related disabilities. (Administrative Record ("A.R.") 146-49, 150-52.) The Commissioner denied Green's claims on April 8, 2009, (id. at 79-83), and then again on reconsideration on October 20, 2009, (id. at 85-87). On November 24, 2009, Green requested a hearing before an

administrative law judge ("ALJ"). (Id. at 93.) This request was granted on December 8, 2009. (Id. at 96-97.) The ALJ held a hearing on January 31, 2011. (Id. at 16.) Then on February 16, 2011, the ALJ concluded that Green was not disabled as defined by the Social Security Act. (Id. at 13-15, 16-27.) The Appeals Council denied Green's request for review on October 14, 2011, (id. at 1-3), thereby rendering the ALJ's decision as the Commissioner's final decision, *see Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012). Green initiated this civil action for judicial review of the Commissioner's final decision, *see* 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of this court, *see* 28 U.S.C. § 636(c). Before the court are Green's motion for summary judgment and the Commissioner's cross-motion for summary judgment.

## Background

Green, who currently is 42 years old, lives with his elderly mother and stepfather in Chicago, Illinois. Although the record suggests that Green completed the eighth grade, he reads at a first-grade level and does not have a driver's license. He has not worked since he resigned in March 2008 from his job as a housekeeper and cleaner at a nursing home. Prior to that, he worked as a truck loader for UPS. Green asserts that he stopped working for the nursing home because the physical demands of the job caused him to feel dizzy, short of breath, and excessively sweaty. Today he claims that he remains unable to work on account of a weak and enlarged heart, shortness of breath, high blood pressure, high cholesterol, and

the lingering effects of two strokes.  At the hearing before the ALJ, Green presented both documentary and testimonial evidence in support of his disability claim.

## A.    Medical Evidence

Green's medical record reaches back to 2006 when he was seen several times by Dr. Stephen Whitmore.  During the initial visit on March 2, 2006, Dr. Whitmore diagnosed Green with hypertension and prescribed several medications.  (A.R. 396.)  Green's blood pressure readings at that time were above normal at 147/94 and 149/92 ("normal" being 120/80 or less).   (Id.)  At a follow-up visit two weeks later, Green's blood pressure was 132/80.  (Id.)  He reported no side effects from his medications and no fluid retention.  (Id.)  A second follow-up four months later reflects a blood pressure reading of 130/82, a diagnosis of hypertension well-controlled by medication, and possible gastroenteritis.  (Id. at 398.)

On April 21, 2008, the month after he quit working, Green arrived at the Jackson Park Hospital emergency room complaining of recurring but intermittent chest pain, dizziness, and sweatiness, along with difficulty swallowing.  (Id. at 255-57.)  At the time, Green did not complain of any shortness of breath.  (Id. at 257.)  The history sheet portion of the medical notes from that visit reflect Green's history of hypertension and high cholesterol.  (Id. at 258.)  A physical examination at that time was limited because Green felt nauseous, but the treating physician decided to admit him to the hospital to rule out a possible heart attack, control his pain, and monitor his blood pressure.  (Id.)  The next day, Green underwent an electrocardiogram ("ECG") that uncovered several problems: a left axis deviation; a

non-specific intraventricular conduction delay; and two T-wave abnormalities that indicated possible loss of blood supply to the heart. (Id. at 259.)

Two months later, on June 26, 2008, Green went to St. Margaret Mercy Hospital for a Persantine ECG under the care of Dr. Jayesh Madhani. (Id. at 336.) The results of this test were negative. (Id.) However, a nuclear myocardial profusion scan administered that same day revealed an "enlarged left ventricle with [severe] global hypokinesia and a reduced ejection fraction of 25%."[1] (Id. at 337.) Dr. Madhani further noted "no evidence of any reversible or fixed perfusion defects."[2] (Id.)

In furtherance of the disability claim he filed in September 2008, Green was examined by Dr. David Amstel in March 2009. (Id. at 264-72.) In preparation for the visit, Dr. Amstel reviewed documentation, including the Jackson Park Hospital admission notes and lab work, but noted that he had "no subsequent progress notes or discharge summaries" or anything else that would be indicative of cardiomyopathy. (Id. at 264.) Dr. Amstel's notes reflect that he took Green's medical history and made notations of Green's most significant assertions—that he was diagnosed with a heart condition in 2008; that he was told he would need a pacemaker if his heart did not improve; that his chest pains occur between 10-20 times

---

[1] Global hypokinesia means the heart muscle is not contracting as strongly as it should. "Ejection Fraction" is the measurement of how well the heart is pumping. A normal ejection fraction, measured as a percentile, is 50% or higher. An ejection fraction of 25% correlates with a substantial increase in the risk of cardiac arrest and can involve symptoms of shortness of breath, fatigue, irregular heartbeat, pain, nausea, and mental confusion.

[2] A reversible perfusion defect occurs when a part of the heart gets enough blood at rest but not enough blood when under stress.

per day, last for approximately five seconds, and occasionally radiate to his shoulder and left arm; and that he sometimes but not always has shortness of breath, dizziness, and excessive sweating. (Id.) Green detailed his numerous medications and claimed to be reliable in taking each on a daily basis. (Id.) However, Dr. Amstel observed that "several [medications] have not been filled for many months as far back as October 2008." (Id.) Green then said that he sometimes gets his prescriptions filled with a three-month supply to explain the gap in his refill history, to which Dr. Amstel noted that, this possibility notwithstanding, there was still an excess of pills. (Id.) Green then admitted to "occasional medical noncompliance" on the basis that his pills make him "feel sick, shake and feel nauseous." (Id.)

Dr. Amstel's physical examination revealed no significant findings: Green's blood pressure was 158/102; his lungs were clear; his heart rate was regular and without any improper sounds; his pulse was normal; he demonstrated no difficulty moving his limbs; and he had no neurological deficits. (Id. at 265-66.) Dr. Amstel found no evidence of cardiac "volume overload or cardiac decompensation." (Id. at 267.) The only abnormality Dr. Amstel found was for hypertension, "for which the patient then admits occasional medical noncompliance." (Id.) In sum, he wrote: "[t]he patient is able to sit, stand, walk, lift, carry and handle objects. He can hear and speak without limitation." (Id.)

The following month, on April 7, 2009, state medical consultant Dr. Richard Bilinsky reviewed Green's record and found no evidence of a severe medical impairment. (Id. at 273-75.) In addressing Green's claim of having an "enlarged heart, shortness of breath, high

5

blood pressure, stroke and high cholesterol," Dr. Bilinsky observed a lack of medical evidence supporting any of these allegations. (Id. at 273-75.) Noting that Green was partially credible because of his history of chest pain, Dr. Bilinsky nevertheless found significant the absence of any breathing problems or medical evidence consistent with cardiomyopathy. (Id.)

Over the next 20 months, Green visited the University of Illinois Mile Square Health Center ("Health Center") five times. The first visit was in May 2009 and was made with the purpose of establishing care. (Id. at 281.) Dr. Javette Orgain examined Green and took notes on his reported history, including his history of two strokes in 2006 (without hospitalization) and of having a "bad heart." (Id.) Green saw Dr. Orgain again two months later, complaining of shortness of breath. (Id. at 279.) After examining Green and reviewing the records from Jackson Park Hospital, including the abnormal ECG from April 2008, Dr. Orgain diagnosed Green with chest pain and dysphagia (difficulty swallowing). (Id.) Green returned to the Health Center in September 2009, seeking medication refills and again complaining of shortness of breath at night, while walking distances of more than a block and a half, and when taking the stairs. (Id. at 374.) Dr. Orgain noted that Green's blood pressure was high (150/88), but attributed that to the fact he had not taken his blood pressure medication that day. (Id.) She also wrote in her notes that she had advised Green to obtain information regarding his 2008 cardiac tests so that she could review them, and also discussed obtaining a cardiac referral. (Id.)

On December 15, 2010, Green returned again to Dr. Orgain, this time seeking medication refills and the completion of his disability form. (Id. at 381.) Green complained of pain in his left arm and a sensation of his heart fluttering. (Id.) Dr. Orgain wrote in her notes: "ECG: T wave abnormality consider anterolateral ischemia." (Id.) She also advised Green that she was unable to determine his capacity to work without further evaluation, such as by an occupational therapist. (Id.) Green returned to Dr. Orgain a month later, again seeking to have his disability evaluation completed. (Id. at 383.) This time, Dr. Orgain noted the presence of hypertension and "[h]eart disease, not fully defined due to lack of medical records. Patient advised will refer to Stroger [Hospital] for further diagnostic testing to ascertain the scope of patient's cardiac disease as well as OT/PT to better define patient's functional capacity." (Id.) Finally, on January 19, 2011, Green saw Dr. Orgain for medication refills. (Id. at 379.) During this visit, Dr. Orgain noted her impressions of hypertension and heart disease and that she would continue her attempts to ascertain Green's functional disability.[3] (Id.)

Throughout the five years of medical visits outlined above, Green's physicians consistently prescribed numerous medications in treatment of his hypertension and heart problems. Dr. Whitmore prescribed Lovastatin (treats high cholesterol), Verapamil (treats hypertension), and Diovan (treats hypertension, angina and certain heart rhythm disorders).

---

[3] The record does not show whether anyone ordered cardiac tests to further investigate the extent of Green's heart problems.

(Id. at 396.)  Dr. Madhani prescribed Carvedilol (treats mild to severe congestive heart failure), Isordil (prevents angina attacks), and Hydralazine (treats hypertension).  (Id. at 353-54.)  Dr. Orgain prescribed Diovan, Hydralazine, Carvedilol, Isosorb (prevents angina attacks), Amlodipine (treats hypertension), and Enalapril (treats hypertension and congestive heart failure).  (Id. at 351-56.)  The record reflects prescription refill information from Walgreen's and Target from 2008 to 2011.  (Id.)

## B.    Green's Testimony

At the hearing, Green described his work with UPS, where he loaded packages onto trucks, and at the Rainbow Beach Nursing Center.  (A.R. 38, 40-41.)  The nursing home job was demanding, he explained, and involved stripping, waxing, and buffing floors—physical work that required moving heavy hospital beds, which weighed approximately 75 pounds.  (Id. at 39, 43.)  The physicality of the job caused Green to sweat heavily and to feel dizzy and out of breath.  (Id. at 42.)  Green resigned from this job and collected unemployment benefits while looking for something easier.  (Id. at 42-43.)  Green explained that before resigning from his job, he experienced chest pains, fatigue, and excessive sweating and decided to seek medical help from Jackson Park Hospital.  (Id. at 45.)

Upon admission to the hospital to assess his cardiac function, hospital personnel told Green that he would need a cardiac stress test but that they did not want him getting on a treadmill because his heart was too weak.  (Id.)  Instead, Green had an ultrasound and later was given a test involving an injection that sped up his heart rate and in this way simulated

8

being on a treadmill.  (Id. at 45-47.)  Doctors also told Green that he would need a pacemaker if his heart did not improve.  (Id. at 47.)  Green could not identify his different medications, but he did know that they were intended to treat his high blood pressure, high cholesterol, and heart condition.  (Id. at 48-49.)

He experiences chest pain about three to four times a day and finds that walking and heat exacerbate his condition.  (Id. at 62-63.)  Green testified that he has not undergone any other cardiac testing, such as an angioplasty, because he does not have health insurance.  (Id. at 52.)  He stated that the last test he had done was an EKG and that it had shown "blockage." (Id.)  He also stated that Dr. Orgain was working on a referral to another hospital for further testing.  (Id. at 52, 54.)

Green testified that he lives with his mother and stepfather and that he receives food stamps.  (Id. at 54-56.)  He cooks simple meals or relies on meals that can be microwaved, goes to the grocery store occasionally with his mother and stepfather, and does laundry a few times a month.  (Id. at 56-59.)  He can lift groceries, provided they are not too heavy, but has to be careful because his right hand grip is weak.  (Id. at 64.)  He watches TV and plays video games, but if he sits too long his knee swells.  (Id. at 57.)  The medications he takes make him feel dizzy and nauseated, so his doctor advised taking a half a dose instead of a full dose to minimize these side effects.  (Id. at 60.)  He takes naps during the day and finds it hard to sleep at night because he has difficulties breathing.  (Id. at 61, 64-65.)  Sometimes his heart flutters and seems to pause before resuming its beat.  (Id. at 66.)  He does not have an

explanation for what is going on with his heart when it flutters and skips because he has yet to get a referral for further testing. (Id.)

The record also contains a Bureau of Developmental Disabilities Services Daily Activities Telephone Report, dated February 24, 2009, reflecting a conversation between Green and a registered nurse. (Id. at 181-82.) This report adds information regarding Green's daily activities, including food preparation, laundry, and basic hygiene, and also adds details regarding Green's symptoms, anxieties, and his two alleged strokes. (Id.) Green stated during this phone interview that he considers himself a poor reader and that he generally has other people help him when he needs to write something. (Id.) A literacy test added to the record after the hearing but submitted to the Appeals Council and dated April 20, 2011, indicates that Green reads at a first-grade level. (Id. at 247, 399.)

## C.    The Vocational Expert's Testimony

The ALJ also heard testimony from Richard Hammersmith, a vocational expert ("VE"). (A.R. 66.) The ALJ posed the following hypothetical to the VE: whether there are any jobs available for an individual in the younger age category, with limited education and a past work history like Green's, where the individual would be required to lift and carry 20 pounds occasionally, 10 pounds frequently and be on his feet (standing or walking) for about six hours in an eight-hour work day, with normal rest periods, provided there was no exposure to moving or dangerous machinery. (Id. at 68.) Assuming this set of facts, the ALJ inquired whether such an individual would be able to perform a job akin to those Green

performed for UPS and the nursing home. (Id. at 68-69.) The VE answered that Green's prior positions would not be available to this individual. (Id. at 69.) However, the VE explained that jobs meeting the hypothetical parameters do exist—such as a cleaner, an information clerk, an assembly worker, or a hand packager. (Id. at 69-70.) When the ALJ inquired whether illiteracy would impact the ability to perform any of these jobs, the VE opined that the information clerk position would not be available. (Id. at 69.) The VE also testified that if the person were unable to remain on-task for periods of up to 20% of the work day because of fatigue, shortness of breath, and weakness, the jobs of hand-packer and assembly worker also would not be suitable. (Id.) And finally, assuming the same facts, if this person has to be absent a few times a month on a regular basis, he would not be a suitable candidate for any of the proposed jobs. (Id. at 70-71.)

**D.     The ALJ's Decision**

In evaluating Green's claim, the ALJ applied the five-step sequential inquiry for determining a disability, which required him to analyze:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner], *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant can perform [his] past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (quoting *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995)). If at step three of this framework (steps one and two having been answered in the affirmative), the ALJ finds that the claimant has a severe impairment that

11

does not meet one of the impairments listed in Appendix 1, he must "assess and make a finding about [the claimant's] residual functional capacity based on all the relevant medical and other evidence." 20 C.F.R. § 404.1520(e). A claimant's residual functional capacity ("RFC") is the quantification of what he can still do despite his limitations. 20 C.F.R. § 404.1545(a)(1). The ALJ uses the RFC to determine at steps four and five whether the claimant can return to his past work or to different available work. 20 C.F.R. § 404.1520(f), (g). It is the claimant's burden to prove that he has a severe impairment that prevents him from performing past relevant work. *Clifford*, 227 F.3d at 868; 42 U.S.C. § 423(d)(2)(A).

Here, at steps one and two of the analysis, the ALJ determined that Green had not been employed since March 24, 2008, and that he suffers from two severe impairments: hypertension and heart disease, although the latter the ALJ characterized as "not fully defined as per Dr. Orgain." (A.R. 18.) The ALJ did not regard Green's stroke allegations as amounting to a severe impairment, noting that there is no documented medical evidence in the record other than Green's own assertions. (Id. at 22.) Similarly, while the record does include medical references to Green's high cholesterol, the ALJ found the condition to be well-controlled and thus having "no more than a minimal effect on the claimant's ability to work." (Id.)

At step three, the ALJ declined to find that Green has an impairment or combination of impairments that meet or equal one of the listed impairments in 20 C.F.R. § 404, Subpart P., Appendix 1. (A.R. 23.) He determined that Green's hypertension is well-controlled when

Green is "taking his medication." (Id.) Similarly, the ALJ determined that Green's cardiac impairment does not meet the specific criteria of listing 4.02. (Id.) Although the ALJ noted that Green has an ejection fraction of 30% or less, as required by the relevant listing, the listing requires more than this alone; for instance, it also requires evidence of persistent symptoms of acute congestive heart failure within a 12-month period accompanied by fluid retention, or evidence of an inability to perform a specific kind of tolerance test. (Id.)

Turning to steps four and five, the ALJ determined that Green has the RFC to perform "light work . . . except he cannot be exposed to moving or dangerous machinery." (Id.) In so concluding, the ALJ noted that Green's "medically determinable impairments could reasonably be expected to cause [his] alleged symptoms; however, [Green's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible . . . ." (Id. at 24.) The ALJ felt that Green's statements to Dr. Amstel regarding medication compliance poorly reflected on his overall credibility. (Id. at 25.) He further concluded that Dr. Amstel's and Dr. Bilinsky's medical reports, both of which showed essentially normal cardiac function, were entitled to great weight. (Id. at 24-25.) Finally, the ALJ found that Green's RFC would allow him to work as a cleaner, hand packager, or an assembler. (Id. at 25-26.) Accordingly, the ALJ concluded that Green is not under a disability as defined by the Social Security Act and denied his application for benefits. (Id.)

## Analysis

In his motion for summary judgment, Green challenges the ALJ's decision in two respects. First, he argues that the ALJ's credibility analysis is inadequate because it engages in impermissible "cherry-picking" by focusing improperly on a single conversation between Green and Dr. Amstel rather than involving a full analysis of the entire record as required by Social Security Rule ("SSR") 96-7p. Second, he argues that the ALJ impermissibly "played doctor" by favoring his own "layman's view of heart disease" and ignoring abnormal medical tests and examinations supporting the existence of a disabling cardiac condition. (R. 17, Pl.'s Mem. at 8-11.) The Commissioner, on the other hand, argues that the ALJ's credibility determinations were well-grounded in the record and properly explained and thus entitled to deference on appeal. (R. at 20, Def.'s Mem. at 3-4.) The Commissioner further maintains that the ALJ properly evaluated the medical record when determining that Green has the capacity to perform a range of light work. (Id. at 4-7.)

This court confines its review to the reasons offered by the ALJ, *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93-95 (1943)), and examines whether the ALJ's decision is supported by substantial evidence, *Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). This court may not "reweigh the evidence, resolve conflicts, decide questions of

credibility, or substitute [its] own judgment for that of the Commissioner." *Clifford*, 227 F.3d at 869. We must affirm the ALJ's decision if reasonable minds could differ regarding whether the claimant is disabled. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). But remand is warranted if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review," *Steele*, 290 F.3d at 940, or fails to "provide an accurate and logical bridge between the evidence and the conclusion that the claimant is not disabled," *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008) (internal quotations omitted).

## A.      The ALJ's Credibility Determination

The court turns first to Green's contention that the ALJ's credibility analysis is inadequate and in violation of SSR 96-7p. SSR 96-7p requires the ALJ, when assessing the credibility of a claimant's symptoms, to "consider the entire case record and give specific reasons for the weight given to the individual's statements." SSR 96-7p, 1996 WL 374186 at *4 (July 2, 1996). Green argues that the ALJ's sole reliance on Dr. Amstel's observations regarding Green's medication noncompliance was tantamount to "cherry-picking" only such evidence that would support a negative outcome. (R. 17, Pl.'s Mem. at 10.) Green points to statements in the record explaining his non-compliance as the justifiable consequence of unpleasant side-effects and lack of medical insurance. (Id. at 9.) These statements, Green argues, should have been evaluated by the ALJ when determining the credibility of his symptoms. (Id.)

15

Green is correct that SSR 96-7p requires the ALJ to consider the entire case record and detail specifically the weight given to the individual's statements when evaluating the credibility of a claimant's symptoms. However, in this specific instance, the ALJ used Dr. Amstel's findings to opine negatively on Green's general credibility—not to assess the credibility of his symptoms. The Commissioner argues exactly this point in its own motion for summary judgment, stating: "[i]t was not Green's [medical] noncompliance, but the fact that he was demonstrably untruthful about his compliance, that led the ALJ to conclude that Green was not credible." (R. at 20, Def.'s Mem. at 3.) This court recognizes that the ALJ's credibility determination is entitled to deference "[b]ecause [he] is in the best position to determine a witness's truthfulness and forthrightness." *See Shiedeler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012) (internal quotations and citations omitted); *see also Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed.") (citations omitted). Here, the ALJ disbelieved Green to some greater extent because of the inconsistencies in the record about medication compliance and because of overall testimonial vacillations. As such, the court agrees with the Commissioner that the ALJ's reliance on Dr. Amstel's report to determine overall credibility was neither cherry-picking nor patently wrong. *See Shiedeler*, 688 F.3d at 310-11.

Luckily for Green, however, he also tangentially criticizes the ALJ's "boilerplate recital" of his medical symptoms and their effect upon his RFC, and in so doing he

successfully raises the argument that the ALJ failed to give adequate attention to Green's medical symptoms per SSR 96-7p. At issue is the following statement:

> Therefore, after careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(A.R. at 24.) Green contends, and this court agrees, that the ALJ summarily dispatched of nearly all analysis of his symptoms by means of this quick recital. The Seventh Circuit has made abundantly clear that it disapproves of exactly this kind of "unhelpful" and "meaningless boilerplate" statement that adds nothing to the credibility analysis. *See Bjornson v. Astrue*, 671 F.3d 640, 644-46 (7th Cir. 2012). Although an ALJ's inclusion of this language is not in itself grounds for reversal, *see Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012), when it is coupled with a failure to adequately explain why Green's testimony and the observations and comments of other physicians held no weight, amounts to reversible error, *see Punzio v. Astrue*, 630 F.3d 704, 709 (7th Cir. 2011).

Here, the ALJ did engage in a lengthy summary of the medical record, but he did not engage in a meaningful analysis of Green's symptoms, the full medical record or the hearing testimony. The ALJ's general attack on Green's credibility based on his medication compliance statement to Dr. Amstel fails to amount to the kind of analysis he was required to conduct. The ALJ did not give explicit consideration, for instance, to Green's testimony that he sometimes skips medications because they make him feel sick, or that one of his

doctors told him to take half a pill instead of a whole pill. (A.R. 60.); *see Shauger*, 675 F.3d at 696 (ALJ must explore claimant's reasons for failure to follow a treatment plan before drawing a negative inference). Nor did the ALJ discuss Dr. Orgain's medical record notation that Green was unable to take medications as directed because he could not afford them. (Id. at 372.); see SSR 96-7p at *7-8; *Roddy v. Astrue*, ___F.3d___, 2013 WL 197924 at *7 (7th Cir. 2013) (claimant's loss of medical insurance and inability to afford medical procedures is a valid explanation for failure to seek treatment).

Further, there is virtually no analysis, other than the medical summary, of Green's specific cardiac symptoms, such as his shortness of breath, dizziness, and fluttering heartbeat. *See Erwin v. Astrue*, No. 11 CV 1555, 2012 WL 3779036 at *8 (N.D. Ill. Aug. 30, 2012) ("Summarizing medical evidence is no substitute for actual analysis of the medical record."). The ALJ briefly mentions Green's report of shortness of breath at night, but nothing more. (A.R. 24.) And there likewise is no discussion of the myriad medications Green takes, many of which are for his heart, and many of which may produce symptoms of their own. Thus, while it may be true that the ALJ gave careful consideration to Green's symptoms, there is no way for this court to know if this was in fact the case. It is also true that the ALJ may have had other reasons for doubting Green's complaints. For example, the ALJ may have viewed Green's testimony about having lifted a 27" television three months prior to the hearing to be incongruent with his testimony that he typically does not lift anything heavier than a fork or spoon because of his condition and discredited his testimony about his inability

18

to lift. (A.R. 22). Also, the ALJ may have doubted Green's testimony about his medical issues because while he claimed to have suffered two strokes, he failed to present any medical records to support such serious episodes. In other words, the ALJ did not give the reviewing court a fair sense of how he weighed the claimant's testimony. *See Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). While the ALJ is well within his rights to doubt Green's credibility on the whole, as well as the credibility of his alleged symptoms, the ALJ's failure to engage in a meaningful discussion and to build a logical bridge from the evidence to his conclusion justifies a remand.

## B.    The ALJ's RFC Determination

Next, Green argues that the ALJ impermissibly "played doctor" when assessing his RFC and impermissibly substituted his own layman's view of the medical record in lieu of the actual medical record. (R. 17, Pl.'s Mem. at 10-11.) Most glaring, Green argues, is the ALJ's assertion that the many physical examinations on record are all "essentially unremarkable, including normal cardiac findings," (A.R. 24), despite tests and examinations to the contrary; for instance, the nuclear profusion test showing an ejection fraction of 25%, (id. at 337). Green further argues that the ALJ's near-exclusive reliance on Dr. Amstel's single treatment note to conclude that Green is able to perform a variety of jobs in the work force fails to evaluate properly all the evidence in the record about his shortness of breath and chronic chest pain. (R. 17, Pl.'s Mem. at 11.) Once again, in making this argument, Green

relies upon SSR 96-7p's command that the ALJ consider all the evidence in the case record before reaching a conclusion. (Id.)

It is well-established that an ALJ cannot "play doctor" in the sense that he cannot rely on his own independent medical conclusions when rendering a decision. *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009); *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990) ("Common sense can mislead; lay intuitions about medical phenomena are often wrong."). Also well-established is the treating physician rule, 20 C.F.R. § 404.1527(c)(2) (formerly § 404.1527(d)(2)), which provides that a claimant's treating physician is entitled to "controlling weight . . . if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence," *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (internal quotations omitted). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (citations omitted). But if the treating physician's opinion is contradicted by other well-supported evidence, then it is no longer entitled to controlling weight and "is just one more piece of evidence for the [ALJ] to weigh." *Bauer*, 532 F.3d at 608 (internal quotations omitted). In determining the weight to afford the treating physician's evidence, the ALJ may consider factors such as the length, frequency, and nature of the treatment relationship, the level of expertise the physician has in the condition claimed to be disabling, the

supportability of the opinion, and the consistency of the opinion with the entire record. *See* 20 C.F.R. § 404.1527(c).

Here, the ALJ's conclusion that Green's numerous examinations are "essentially unremarkable" is not supported by the medical record. Without question, there are several medical tests in the record that could reflect heart disease, or, at a minimum, abnormal heart function. Green's April 2008 ECG revealed a left axis deviation, a non-specific intraventricular conduction delay and two T-wave abnormalities indicating a possible ischemia. (A.R. 259.) Also, Green's June 2008 nuclear myocardial profusion scan revealed an abnormally "enlarged left ventricle with [severe] global hypokinesia and a reduced ejection fraction of 25%." (Id. at 337.) The ALJ considered these tests at step three when evaluating whether Green's cardiac condition satisfied the listing, but he neglected to consider their relevance at step five when determining whether Green had the RFC to perform light work. By his own acknowledgment, the ALJ was required to consider "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." (Id. at 23.) He cannot fall back on a simple recitation of the medical evidence and then fail to engage in a meaningful discussion of both medical and non-medical evidence. *See* SSR 96-8p, 1996 WL 374184 at *7 (July 2, 1996) (RFC assessment must include narrative discussion how the evidence supports each conclusion and how inconsistencies or ambiguities were considered and resolved). That is not to say that the ALJ is required to discuss each and every detail of the

medical record, only that he render an opinion of sufficient transparency and specificity "to make clear to the individual and any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Zurawski*, 245 F.3d at 887. This is necessary to ensure the full and fair resolution of each individual's claim and to encourage well-reasoned decisions. This did not happen in this case.

Also noticeably absent from the ALJ's RFC analysis is any meaningful discussion of Green's treating physician, Dr. Orgain. "A treating physician's opinion . . . is entitled to controlling weight if it is well-supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(c)(2). An ALJ may discount an inconsistent treating physician's medical opinion, provided "he minimally articulates his reasons for crediting or rejecting evidence of disability." *Schmidt*, 496 F.3d at 842 (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (internal citations and quotations omitted)). Here, the ALJ failed to engage in any analysis of Dr. Orgain's medical examinations. True, Dr. Orgain did not opine as to the extent of Green's disability—she in fact refused to so—but she did consider his condition sufficiently worrisome to warrant further evaluation at Stroger Hospital, and she did consider Green to have heart disease of some form. (A.R. 383.) As such, her medical records fly in the face of the ALJ's contention that the many physical examinations on record were all "essentially unremarkable." (Id. at 24.) The court is not judging whether Dr. Orgain's medical records are consistent with the record as a whole, or whether they are even entitled

to any weight—merely that the ALJ failed to explain, or even mention, why Dr. Amstel's single examination was worthy of great weight while the treating physician's five examinations were worthy of no consideration at all. *See* 20 C.F.R. § 404.1527(c)(2) (explaining factors to be considered when not giving the treating physician controlling weight). The ALJ cannot simply select facts supporting a finding of non-disability and ignore the rest. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (an ALJ need not mention every piece of evidence, so long as he builds a logical bridge from evidence to conclusion).

## Conclusion

For the foregoing reasons, Green's motion for summary judgment is granted to the extent it seeks a remand for further proceedings and the Commissioner's motion for summary judgment is denied.

**ENTER:**

**Young B. Kim**
**United States Magistrate Judge**